RECEIVED

FEB – 7 2012

TONY R. MOORE, CLERK
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

RONALD D. HEARD

versus

CIVIL ACTION NO. 09-1950
JUDGE TOM STAGG

UNITED PARCEL SERVICE, INC.

---

## MEMORANDUM RULING

Before the court is a motion for summary judgment filed by the defendant, United Parcel Service, Inc. ("UPS"). See Record Document 27. For the reasons set forth below, UPS's motion for summary judgment is **GRANTED**.

### I. BACKGROUND

This case concerns employment-related race and disability based claims of discrimination. Ronald D. Heard ("Heard"), an African American, asserts that UPS discriminated against him when it failed to promote him and because of his physical disability. Heard began working for UPS in 1994 as a loader/unloader and was promoted to a full-time supervisor position in 1999. From 2002 until approximately January of 2009, Heard served as the night hub operation supervisor. The night hub shift begins at 10:00 p.m. and ends at approximately 5:00 a.m. to 6:00 a.m.

### A.    Promotion Facts.

Heard was supervised by Reginald Wells ("Wells"), an African American, who was on a performance improvement plan because his department, the hub operation,

was not meeting the expected operations numbers.  Wells supervised Heard and Nicholas "Butch" Rinaudo ("Rinaudo"), a Caucasian.  Wells was ultimately demoted in September of 2008.[1]

When Wells was demoted, the Division Manager, Thomas Clay Burrough[2] ("Burrough"), who is Caucasian, had to select a replacement for Wells from the current supervisors at the Shreveport facility, because Burrough did not have approval to move someone from another facility.  As the Division Manager, Burrough was in possession of his managers' evaluations of their respective supervisors and their recommendations of who was ready to be promoted.  At the time, Herb Encalarde ("Encalarde"), an African American, who was the Business Manager at the Shreveport facility, was supervising Charles "Pat" Defee ("Defee"), a Caucasian, in his position as preload supervisor.  Encalarde had rated Defee as "Ready Now" for promotion.  Wells had rated Heard as "Not Ready" for promotion.  Burrough agreed with these assessments and, considering these and other factors, chose Defee for promotion.

**B.    Disability Facts.**

Heard had a history of arthritis in his right knee for which he took two leaves of absence from UPS.  In June of 2007, Heard was prescribed knee injections.  He began the injections on September 14, 2007.  On September 3, 2007, Heard had

---

[1]Wells became hub manager of Shreveport in late 2007, after spending six months in Ruston, Louisiana, as the preload supervisor.

[2]Burrough became the Division Manager in 2007.

been given a special assignment in the safety department by Burrough.  In response, Heard had informed Burrough that he would not be able to do the job right away because he was having knee troubles and needed injections.  Heard's doctor deemed him unable to work for three to five weeks while he received the injections. Accordingly, Heard took a leave of absence and received short-term disability benefits.  Thereafter, Heard returned to work with some restrictions.  His position at work upon his return was intended to be a traveling position, but Burrough accommodated Heard by allowing him to perform the job in Shreveport only.  By December 6, 2007, Heard was released to return to work with no restrictions.

Heard did not see his doctor again until the following year, on August 7, 2008.  At that time the doctor again recommended knee injections.  Heard spoke to his supervisor at the time, Wells, about taking off one day a week (the day following each injection), and Wells agreed to Heard's request, allowing it to be used as a discretionary day. Wells did not discuss Heard's request with Burrough.  Heard went to the doctor for an injection on September 4, 2008.

On September 5, 2008, Heard learned that Wells had been demoted.  On September 9, 2008, Burrough met with Heard and Rinaudo to announce that Defee would take Wells's place as hub manager.  Burrough also told Heard and Rinaudo that they would be expected to work longer hours than they had been working in an effort to increase productivity.  See Record Document 27, Ex. A at 97-99, 100-01. In his deposition, Heard testified that in September of 2008, he asked Burrough if he could work shorter hours than Burrough had instructed, and also take one

3

discretionary day off per week to receive injections for his knee.  See id., Ex. A at 109-110.  Heard did not have a doctor's note showing that he could not work the requested hours, so Burrough told Heard that he needed to get a note from his doctor. Heard asserts that Burrough told him to "stay home until he could be at work 100%." Record Document 29 at 12.   Heard went to his doctor, who issued a Work Status Report on September 11, 2008, stating that Heard was unable to work at all and that Heard would be reevaluated on October 6, 2008.  See id., Ex. A at 133-135 and Ex. 30.  Following receipt of this doctor's note, UPS granted Heard a medical leave and Heard received short-term disability payments.

Heard returned to work in December of 2008 with no restrictions.  He was asked to assume the on road supervisor job.  At that time, he stated that he was unable to obtain certification from the Department of Transportation ("DOT") and instead asked to perform the preload supervisor job.  Heard initially spoke with Encalarde, the Business Manager, and told Encalarde that he could not drive a vehicle because he failed his DOT certification.[3]  When Burrough learned that Heard could not work as the on road supervisor, Burrough immediately notified Human Resources and began the interactive process.  A meeting was held with Heard and Burrough and

---

[3]Heard claims that Encalarde allowed him to work on the preload for a few days while UPS sorted out his medical needs.  See Record Document 27, Ex. A at 191-92.  According to Encalarde, he did not assign Heard to preload at all.  See Record Document 27, Ex. B at 18.

4

Roman Williams ("Williams")[4] from Human Resources to determine the extent and nature of Heard's limitations.  In that meeting, Heard stated that he could not drive safely.  Burrough and Williams advised Heard that the on road supervisor position was the only position available at the time and that if Heard did not feel comfortable performing the job, then he should not perform it.  Williams advised Patricia Lorio ("Lorio"), the UPS Occupational Health Supervisor, of Heard's situation, and Lorio took over responsibility for the interactive process and determining what positions Heard could perform.

## II.  LAW AND ANALYSIS

### A.    Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5]  Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010).  "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004).  If the movant

---

[4]Williams is African American.

[5]The court notes that the newly amended Rule 56 requires that there be "no genuine **dispute** as to any material fact," but this change does not alter the court's analysis.  Fed. R. Civ. P. 56(a) and advisory committee's note (emphasis added).

demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). The Fifth Circuit has cautioned that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy" the nonmovant's burden in a motion for summary judgment. Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).

**B.    Heard's Race Claim--Failure To Promote.**

Heard alleges that UPS failed to promote him for race-based, discriminatory reasons. "An employee can prove discrimination through direct or circumstantial evidence." Jones v. Robinson Prop. Group, L.P., 427 F.3d 987, 992 (5th Cir. 2005). Heard does not claim that he possesses direct evidence of discrimination which supports his failure to promote claim. See id. at 993 (providing descriptions and examples of direct evidence of discrimination which do not match the evidence presently before this court in regard to Heard's failure to promote claims). It is clear that Heard is relying on circumstantial evidence to support his present claims.

"Cases of discrimination based on circumstantial evidence are subject to the

6

McDonnell Douglas burden-shifting analysis." See Davis v. Dallas Area Rapid Transit, 383 F.3d 309, 316-17 (5th Cir. 2004) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824 (1973)).

> To survive summary judgment under McDonnell Douglas, the plaintiff must first present evidence of a prima facie case of discrimination. If the plaintiff presents a prima facie case, discrimination is presumed, and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the underlying employment action.[6] If the employer is able to state a legitimate rationale for its employment action, the inference of discrimination disappears and the plaintiff must present evidence that the employer's proffered reason was mere pretext for racial discrimination.[7]

Davis, 383 F.3d at 317 (citations omitted).[8]

### 1.    Legitimate, Nondiscriminatory Reasons.

Even if the court assumes, arguendo, that Heard has established a prima facie case of a discriminatory failure to promote, his failure to promote claim still fails to

-----

[6]"This burden on the employer is only one of production, not persuasion, involving no credibility assessments." Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000).

[7]"[A] plaintiff must present sufficient evidence to find that the employer's asserted justification is false." Crawford v. Formosa Plastics Corp., 234 F.3d 899, 903 (5th Cir. 2000) (citations and quotations omitted).

[8]Louisiana courts and federal courts applying Louisiana law have routinely looked to federal jurisprudence to interpret Louisiana employment discrimination statutes. See Smith v. Amedisys Inc., 298 F.3d 434, 448 (5th Cir. 2002).

satisfy the standards necessary to survive summary judgment.[9]  UPS has asserted legitimate, nondiscriminatory reasons for failing to promote Heard.  See Record Document 27 at 10-12.  UPS asserts that Burrough and others in management considered Defee to be the stronger supervisor (and the supervisor most ready for promotion), and that it made no sense to promote Heard to Wells's position when Heard's performance problems possibly contributed to Wells's demotion.  See id. at 10.  Heard has failed to prove that these nondiscriminatory reasons are mere pretext for racial discrimination, thus summary judgment is appropriate.

One of UPS's legitimate, nondiscriminatory reasons is that there was a better qualified candidate for the position Heard desired.  See id.; see also Patrick v. Ridge, 394 F.3d 311, 318 (5th Cir. 2004) ("We acknowledge that choosing some other candidate because he is the best-qualified individual for the job is generally a legitimate, nondiscriminatory reason for an adverse employment decision.").  The Fifth Circuit has held that under the governing law, "the employer's judgment as to qualifications will not be probative of the issue of a discriminatory motive unless the qualifications are so widely disparate that no reasonable employer would have made

---

[9]UPS does not concede that Heard has proved his prima facie case of discrimination, but it instead chose to focus its argument on its legitimate, non-discriminatory reasons for the promotion decision.  See Record Document 27 at 10 n.12.

8

the same decision." <u>Deines v. Tex. Dep't of Protective & Regulatory Servs.</u>, 164 F.3d 277, 282 (5th Cir.1999).   Heard must present evidence from which a jury could conclude that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." <u>Id.</u> at 280-81.   "Showing that two candidates are similarly qualified does not establish pretext under this standard." <u>Price v. Fed. Exp. Corp.</u>, 283 F.3d 715, 723 (5th Cir. 2002) (citation omitted).   "Better education, work experience, and longer tenure with a company do not necessarily establish that an applicant is clearly better qualified for a position." <u>Manora v. Donahoe</u>, 439 F. App'x 352, 357 (5th Cir. 2011) (citing <u>Price</u>, 283 F.3d at 723).   "Ultimately, the law requires only that the employer's decision is 'somewhere within the realm of reason.'" <u>Id.</u> (quoting <u>Deines</u>, 164 F.3d at 282). "This is because the judicial system is not as well suited to evaluate professional qualifications as those who have trained and worked for years in the relevant field of endeavor." <u>Id.</u> (citing <u>Deines</u>, 164 F.3d at 280).

The candidate who ultimately received the promotion was Defee.  Heard does not cite any evidence which would indicate that Burrough's selection of Defee was inspired by race-based discrimination.  Furthermore, a review of the backgrounds of the people considered for this position by Burrough does not demonstrate that Heard was clearly better qualified than Defee for the contested position.

9

Defee began at UPS in 1989 as a loader/unloader and continued in that capacity as an hourly employee until approximately November of 2006, when he was promoted to preload supervisor. On September 10, 2007, Defee was assigned to a hub supervisor position. Defee had less experience in supervising the hub operation, having been classified as hub supervisory for less than a year and a night hub supervisor briefly in 2007.[10] However, Burrough testified that choosing someone for the supervisor position did not "have anything to do with seniority." Record Document 27, Ex. C at 90. He further explained that the choice was based upon "attitude, job performance, maturity, how well you get along with people." Id.

Heard began his employment at UPS as a loader/unloader and was promoted to a full-time supervisor position in 1999. From 2002 until approximately January of 2009, Heard served as the night hub operation supervisor. In his deposition, Burrough testified that he considered Defee to be the strongest candidate for the position based on Burrough's assessment of the performances of Defee, Heard and Rinaudo. See Record Document 27, Ex. C at 51-55 and 112-113. Burrough did not consider Rinaudo or Heard to be good choices to replace Wells because the poor numbers Wells was producing were part of the reason Wells had been demoted.

---

[10]Defee was asked to fill in as night hub supervisor during September of 2007, when Heard took medical leave to receive knee injections.

10

Burrough believed that it made no sense to replace Wells with either of the two supervisors whom Wells was unable to hold accountable.  Burrough also believed that Heard was defensive and argumentative, and Encalarde agreed with Burrough's assessment.  See id., Ex. B at 41 and Ex. C at 88.  Burrough testified that he believed that Defee was the "strongest candidate" and that he chose Defee because of his "overall maturity, being able to work with people and some of the his past job performance . . . ."  Record Document 27, Ex. C at 52.  In light of all of these considerations, Heard simply has not shown that he was "clearly better qualified" than Defee.

### 2.   Pretext.

The foregoing evidence proffered by UPS satisfies its burden of providing legitimate, non-discriminatory reasons for failing to promote Heard.  Accordingly, the presumption of unlawful discrimination disappears, and the burden shifts back to Heard to prove that the proffered reasons are a pretext for discrimination.  See McDonnell Douglas, 411 U.S. at 802-04, 93 S. Ct. at 1824-25.  The ultimate determination in the summary judgment context is whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable factfinder could infer discrimination. See Crawford v. Formosa Plastics Corp., 234 F.3d 899, 902 (5th Cir. 2000); Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142-43, 120 S. Ct. 2097,

2106 (2000).  In making this determination, a court should consider "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case. . . ." Crawford, 234 F.3d at 902 (quoting Reeves, 530 U.S. at 148-49, 120 S. Ct. at 2109). The Fifth Circuit Court of Appeals has recognized the difficulty in proving discrimination by direct evidence.  See LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 449 (5th Cir. 1996). Thus, the strength of the circumstantial evidence supporting the plaintiff's prima facie case and showing the defendant's proffered reason is false may be enough to create an inference of discrimination.  See Crawford, 234 F.3d at 902; Reeves, 530 U.S. at 148, 120 S. Ct. at 2109.

A mere scintilla of evidence of pretext does not create an issue of material fact in all cases.  See Crawford, 234 F.3d at 902; Wyvill v. United Cos. Life Ins. Co., 212 F.3d 296, 301 (5th Cir. 2000).  The plaintiff must present "sufficient evidence to find that the employer's asserted justification is false."  Crawford, 234 F.3d at 903 (quoting Reeves, 530 U.S. at 148, 120 S. Ct. at 2109).  The determination is to be made on a case-by-case basis, depending on the nature, extent, and quality of the evidence, as to whether a jury could reasonably infer discrimination.  See id.

Heard has failed to present sufficient evidence of pretext to support a reasonable inference of discrimination on the basis of race in this case, and has failed

to demonstrate a genuine issue of material fact as to whether UPS's employment action was illegally motivated.   First, Heard asserts, without explanation, that "[b]ecause the inconsistency in the stated reasons for the adverse employment decision is evident from a review of the summary judgment evidence, this Court should consider that there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its failure to promote Mr. Heard." Record Document 29 at 8-9.  Heard continues to allege that "[t]he explanations of Mr. Burrough are simply so inconsistent as to his reasons for selecting Pat Defee, who was clearly less qualified by experience, training, and other attributes, than Mr. Heard, as to defy belief." Id. at 9.  However, these self-serving arguments do not illustrate pretext.  As noted previously, Burrough stated in his deposition that seniority was not a factor in the selection of the replacement for Wells.   Neither were "training, and other attributes" listed as selection criteria by Burrough.  Thus, Heard's conclusory attempt to illustrate pretext in this regard fails.

In another attempt to illustrate pretext, Heard summarily asserts that "the testimony of Reginald Wells creates a genuine issue of material fact on the promotion issue, as Mr. Wells felt Ronald Heard was better qualified for the position." Record Document 29 at 11.  Heard fails to mention that Encalarde, an African American,

13

stated in his deposition that he agreed with the decision to choose Defee. See Record Document 27, Ex. B at 25 and 44. In addition, Heard fails to address the fact that Wells rated Heard as "Not Ready" for promotion. Furthermore, neither Wells nor Encalarde was the decisionmaker in choosing the replacement for Wells. Moreover, the court finds it questionable that Heard would believe an issue of pretext could be created from the testimony of the supervisor who was demoted for performance issues, when Wells was supervising Heard at the time he was demoted.[11]

Heard next attempts to meet his burden of showing pretext by asserting that he was treated differently with respect to temporary alternative work ("TAW"). Heard alleges that TAW is a "provision in the Master Service Agreement of the Teamsters Union with UPS and applies to hourly workers who are union workers, not to management." Record Document 29 at 10. Heard asserts that Defee, a non-hourly member of management, was allowed TAW when he was injured, whereas Heard was not. However, as UPS correctly noted, Heard did not show that Defee was treated differently under "nearly identical circumstances." Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 221 (5th Cir. 2001). Heard did not present any evidence regarding the nature or extent of the injuries suffered by Defee in comparison to Heard or the

---

[11]The court notes again that Rinaudo, a Caucasian under the supervision of Wells, was also not promoted.

14

availability of open positions at the relevant times.  In addition, Heard seems to admit that Defee was injured while on the job, while Heard was not; thus, there was a clear distinction between the two situations.  Furthermore, Burrough did not make the decision to provide Defee with TAW.  The decision to do so was made by Human Resources.  <u>See</u> Record Document 27, Ex. C at 59-60.  Therefore, the issue regarding TAW does not indicate discriminatory bias by Burrough.[12]

Regardless of Heard's explanations, the fact remains that his supervisors perceived a problem with his performance and attitude.  Heard has offered no proof that anything other than the reasons proffered by UPS motivated the failure to promote him.  He has offered no evidence that Burrough did not believe the rating of Wells when he determined that Heard was "Not Ready" for a promotion.  Heard has failed to put forth evidence that demonstrates that UPS's reasons were false or were

---

[12]Heard also attempts to ignore the law regarding his burden of proof and shift the burden to UPS, stating that "UPS has not conclusively demonstrated that discrimination was not its true motivation."  Record Document 29 at 9.  However, as is well-established by caselaw, the ultimate burden of proving discrimination rests with Heard alone.  See <u>McCoy v. City of Shreveport</u>, 492 F.3d 551, 557 (5th Cir. 2007) (stating that the plaintiff bears the ultimate burden of proving that the employer's proffered reason is not true but instead is pretext).   Heard further attempts to illustrate pretext by arguing that the operational numbers declined after Defee was promoted.  However, whether the operational numbers declined *after* Defee was promoted is irrelevant and obviously did not factor into Burrough's decision to promote Defee over Heard.

a pretext for discrimination.[13]

Heard's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. See Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). He has brought forth nothing but conclusory allegations to show that the failure to promote him was based upon any reason other than the ones articulated by UPS. His allegations are clearly insufficient to defeat UPS's motion for summary judgment. See Bynum v. FMC Corp., 770 F.2d 556, 576 (5th Cir. 1985); Richardson v. Oldham, 12 F.3d 1373, 1378 (5th Cir. 1994) (holding that "[m]ere conclusory allegations are not competent summary judgment evidence . . . ."). In order to survive summary judgment, Heard must demonstrate that UPS acted with discriminatory intent. See Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (5th Cir. 1995). This he has not done.

Title VII does not protect an employee against unfair employment decisions. Instead, it protects against employment decisions based upon discriminatory animus.

───────────────

[13]A careful review of this summary judgment record also yields no evidence that Burrough had any racial enmity. In his deposition, Encalarde stated: "I have known Clay [Burrough] for a while and I have never seen Clay do or say anything that would make me believe that Clay had had a problem with the color of skin. None at all." Record Document 30, Ex. B at 33. Furthermore, even Heard admitted that Burrough never made any racial comments or said anything to indicate that he had a problem with race. See Record Document 27, Ex. A at 240-41.

See Nieto v. L&H Packing Co., 108 F.3d 621, 624 (5th Cir. 1997). UPS management concluded that Heard was not the best candidate for the vacant position based upon many factors. UPS can make an employment decision that may be perceived by some as incorrect, but if that decision is based upon a good faith belief with no discriminatory influences, as happened with the decision to promote Defee instead of Heard, then the court will not question the validity of the reasons. See Mayberry, 55 F.3d at 1091. The ratings that Heard received and the poor performance in his area of work, in addition to the perception by Burrough (and Encalarde) that Heard was difficult to deal with, were the sources of this employment action, and Heard has provided no evidence that the decision to promote Defee was motivated by race. Taken as a whole, and viewing all facts and inferences in a light most favorable to Heard, the court finds that the arguments submitted and the evidence cited by Heard fail to create a fact issue as to whether UPS's stated legitimate, nondiscriminatory reasons for its failure to promote him were false or mere pretext for race-based discrimination. Accordingly, UPS's motion for summary judgment will be granted as to Heard's failure to promote claim.

## C.   Failure To Reasonably Accommodate.

The ADA requires an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a

17

disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). The ADA requires employers to accommodate the limitations arising from a disability, not the disability itself; therefore, an employee seeking to assert a disability discrimination claim must produce evidence that the employer knew not only of the employee's disability, but also of the physical or mental limitations resulting therefrom. See Seaman v. CSPH, Inc., 179 F.3d 297, 300 (5th Cir. 1999)(citation omitted).

To establish a claim for discrimination for failing to accommodate, Heard must show that (1) he had a disability; (2) he was qualified for the job; (3) UPS knew of the disability; (4) he requested an accommodation; (5) a reasonable accommodation existed that would have allowed him to perform the essential functions of the job; and (6) UPS failed to provide a reasonable accommodation. 42 U.S.C. § 12112(b)(5)(A); Riel v. Elec. Data Sys. Corp., 99 F.3d 678, 683 (5th Cir. 1996). "When no reasonable accommodation can be made to the plaintiff's prior job, he may be transferred to another position." Jenkins v. Cleco Power, LLC, 487 F.3d 309, 315 (5th Cir. 2007) (citation omitted). "The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform." Id. (citation omitted).

"An employee who needs an accommodation because of a disability has the

18

responsibility of informing [his] employer." E.E.O.C. v. Chevron Phillips Chem. Co., LP, 570 F.3d 606, 621 (5th Cir. 2009).  The Fifth Circuit has recognized that "'where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.'"  Id. (quoting Taylor v. Principal Fin. Grp., 93 F.3d 155, 165 (5th Cir. 1996)).

"The ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation."  Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 224 (5th Cir. 2011) (citing E.E.O.C. v. Agro Distrib., 555 F.3d 462, 471 (5th Cir. 2009)).  "A disabled employee has no right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously."  Jenkins, 487 F.3d at 316.  Once an employee makes a request for reasonable accommodations, the employer is obligated by law to engage in an "interactive process" or "a meaningful dialogue with the employee to find the best means of accommodating that disability."  Chevron Phillips Chem. Co., LP, 570 F.3d at 621 (internal quotations and citation omitted).  "When an employer does not engage in a good faith interactive process, that employer violates the ADA."  Id. "[W]hen an employer's unwillingness to engage in a good faith interactive process

19

leads to a failure to reasonably accommodate an employee, the employer violates the ADA." Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 736 (5th Cir. 1999). However, "an employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer." Id.

UPS does not concede that Heard has shown that he is covered by the ADA or that he is an individual with a disability. UPS instead contends that Heard cannot prove that UPS had notice of Heard's disability or limitations and failed to provide a reasonable accommodation. Heard requested two accommodations--to work shorter hours and to work as the preload supervisor as opposed to the on road supervisor.

### 1.    Heard's Request To Work Shorter Hours.

As previously detailed above, Heard testified that in September of 2008, he asked Burrough if he could work shorter hours than Burrough had instructed, and also take one discretionary day off per week to receive injections for his knee. See Record Document 27, Ex. A at 109-110. Heard did not have a doctor's note showing that he could not work the requested hours, so Burrough told Heard that he needed to get a note from his doctor. Heard asserts that Burrough told him to "stay home until he could be at work 100%." Record Document 29 at 12. Heard went to his doctor, who issued a Work Status Report on September 11, 2008, stating that Heard was unable

to work at all and that Heard would be reevaluated on October 6, 2008. See id., Ex. A at 133-135 and Ex. 30. Following receipt of this doctor's note, UPS granted Heard a medical leave and Heard received short-term disability payments.

UPS contends that Heard's requested accommodation was "obviated by his physician's directive" that Heard should not be working at all. See Record Document 27 at 18. UPS asserts that it accommodated Heard by providing him with a leave of absence, which was the accommodation prescribed by Heard's doctor. Heard, however, contends that Burrough's comment that Heard needed to be at 100% was the reason that he did not return to work.

Heard argues that at least one court has found such a 100% healed policy to be a per se violation of the ADA, citing a case from the Northern District of Iowa. See Hutchinson v. United Parcel Serv., Inc., 883 F.Supp 379 (N.D. Iowa 1995). Heard continues his argument by asserting that when he was told to stay home until he could work at 100%, he felt he had no choice but to take short term disability leave again to have his injections. Heard, however, fails to mention that his recollection of what exactly was said by Burrough has evolved over time. In his EEOC charge, Heard stated, "According to Clay Burrough, Division Manager: . . . he needs me to be '100%.'" Record Document 30, Ex. 77. In an affidavit, Heard stated, "Clay told me that he needs me to be at 100%, so if I couldn't meet the new schedule I needed to get

21

the appropriate paperwork from my doctor to excuse me from work until I could meet the full demands of the job." Id., Ex. 33. Heard's deposition provides additional versions. As UPS accurately argues, whether the statement would violate the ADA depends upon the precise language used.

The Fifth Circuit does not appear to have clearly provided a stance regarding "100% healed" policies. However, various other courts have found that such policies discriminate against qualified individuals with disabilities because they permit employers to substitute a determination of whether a qualified individual is "100% healed" from his injury for the required individual assessment of whether the qualified individual is able to perform the essential functions of his job with or without the accommodation. See Barton v. Checkers Drive-In Rest., Inc., No. 11-0186, 2011 WL 1193061 n.19 (E.D. La. Mar. 28, 2011) (citing McGregor v. Nat'l R.R. Passenger Corp., 187 F.3d 1113, 1116 (9th Cir. 1999)); Henderson v. Ardco, Inc., 247 F.3d 645, 653 (6th Cir. 2001) (recognizing that 100% recovery rules may have an impermissible discriminatory impact where rule allows for no subjective inquiry into individual's abilities to perform certain available jobs); Hutchinson v. United Parcel Serv., Inc., 883 F.Supp. 379, 397 (N.D. Iowa 1995); Stillwell v. Kan. City Bd. of Police Comm'rs, 872 F.Supp. 682, 686-87 (W.D. Mo. 1995). By Heard's own admission, Burrough told Heard that he needed to obtain a note from his doctor

22

detailing Heard's restrictions.  Such request is not akin to a "fully healed" policy.

The note Heard obtained from his doctor stated that he was "totally disabled for work."  UPS accommodated this statement from Heard's doctor by providing Heard a leave of absence.

### 2.   Heard's Request To Work As The Preload Supervisor.

Heard complains that during the interactive process, he should have been allowed to work as a preload supervisor.  However, the summary judgment evidence shows that the position of preload supervisor was not open at the time.  Both Burrough and Encalarde testified in their depositions that the preload supervisor position was not open at the pertinent time. See Record Document 27, Ex. B at 17-18 and Ex. C at 94-95.  "The ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." Id.  "The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform." Jenkins, 487 F.3d at 315.  As previously mentioned, "[a] disabled employee has no right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously." Id. at 316.  As the position was not available, Heard cannot complain that UPS violated the ADA by not placing him in the preload supervisor position.

### 3.   Interactive Process Breakdown.

On November 25, 2008, Heard's doctor stated that Heard could return to work as of December 4, 2008.  The doctor's Work Status Report stated that Heard could return to work with "no limitations."  Record Document 27, Ex. 42.  Heard returned to work on December 4 and went to UPS's physician for a return to duty physical.  The UPS physician also released Heard to return to work "without any need for accommodations."  Id., Ex. 43.

Heard had been working in different spots during peak season.  Burrough notified Heard that he was being assigned to the on road supervisor position, which was still a full-time supervisor position but a different assignment.  Heard, however, did not believe that he was safe to drive and the job required driving.  Following Heard's assignment as on road supervisor, Heard's doctor issued a work release including a driving restriction at Heard's request.

Once UPS was told that Heard could not drive, UPS sent Heard paperwork to begin the ADA interactive process, including a form for Heard's physician to complete regarding Heard's limitations.  Two days later, on January 16, 2009, Heard's physician responded with a letter that stated, in pertinent part: "I am not with him at work to see what causes him pain, therefore, if you want a more detailed analysis of what his restrictions should be, I would suggest we refer him for a

Functional Capacity Evaluation (FCE)."  Record Document 27, Ex. 59.  Heard's

physician supplemented his response by responding to UPS's questionnaire.  When

asked about the degree and extent of job restrictions and the activities that Heard was

limited in performing, the physician wrote, "cannot say." Id., Ex. 61.  Heard's doctor

reiterated, "I recommend patient have FCE that would give you objective information

on his limitations." Id.

On February 6, 2009, UPS replied to Heard's physician by letter and copied

Heard.  In the letter, UPS stated:

> In order to continue with the ADA qualification process, additional
> information is needed . . . .  Located under #3 a and b, a listing of
> specific restrictions is required to proceed with the process.  You do
> recommend an FCE for "objective information on his limitations."  UPS
> does not approve or deny any medical testing or treatment.
>     Please forward the additional information requested in order to
> continue with Ronald D. Heard's request for an ADA accommodation.

Id., Ex. 62.  No response was received.  Instead, Heard remained off work receiving

disability benefits for the next four months.  UPS sent Heard another letter on June

15, 2009, reminding Heard that "UPS offers job-related accommodations for persons

who are disabled" within the meaning of the ADA and instructing Heard to contact

UPS if he was interested in requesting an ADA accommodation. Id., Ex. 65.

On June 30, 2009, Heard responded by calling Lorio, the UPS Occupational

Health Supervisor.  Lorio told Heard that the accommodation process had stopped

when he did not obtain the FCE or otherwise provide the requested medical information about his restrictions.  See Record Document 27, Ex. E at 2-3 (Lorio Affidavit) and Ex. 66.  Heard scheduled an FCE for July 24, 2009, and the evaluation was followed by a report of the same date.  See id., Exs. 67 and 68.

Wilfred Edwards with UPS sent Heard a letter on August 26, 2009, stating that UPS had evaluated his request and needed to schedule a meeting with him.  See id., Ex. A-1 at Ex. 75.  The meeting occurred on August 31, 2009.  UPS offered Heard a position as preload supervisor, and Heard remains in this position today.

Heard has no evidence that UPS failed or refused to engage in the interactive process.  To the contrary, the summary judgment evidence indicates that UPS was fully engaged in the interactive process.  The delay in the interactive process in 2009 occurred because neither Heard or his physician gave UPS notice of the limitations that Heard was experiencing and the accommodations he needed.  As noted, "an employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer."  Loulseged, 178 F.3d at 736.  The court concludes that the breakdown in the interactive process was attributable to Heard, not UPS.

### III.  CONCLUSION

Based on the foregoing analysis, the defendant's motion for summary judgment (Record Document 27) is **GRANTED**. A judgment consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this 7th day of February, 2012.

_____
JUDGE TOM STAGG